[No. 5614. Decided September 15, 1905.]

# J. E. REYNOLDS, *Respondent*, v. GREAT NORTHERN RAILWAY COMPANY, *Appellant*.[1]

CARRIERS — LIVESTOCK — DUTY TO UNLOAD FOR REST, FOOD AND WATER—CONFINEMENT FOR 28 CONSECUTIVE HOURS—VIOLATION OF FEDERAL STATUTE—NEGLIGENCE PER SE—PLEADING—COMPLAINT—SUFFICIENCY. The confinement, by a common carrier, of livestock for more than twenty-eight consecutive hours without unloading for rest, food or water, in violation of the Federal statute, where the shipment is from one state to another, is negligence *per se*, and a complaint for damages therefor need only allege the violation of the statute and the resulting injury.

APPEAL AND ERROR—REVIEW—HARMLESS ERROR. Errors in ruling on the findings are harmless in actions triable *de novo* on appeal.

CARRIERS — LIVESTOCK — INTERSTATE SHIPMENT — CONTRACT — EXEMPTING FROM STATUTORY LIABILITY—VALIDITY. A provision in a contract for the carriage of livestock, exempting the carrier from liability for loss sustained through the violation of a statutory duty, is void.

CARRIERS—LIVESTOCK—CONTRACT REQUIRING SHIPPER TO UNLOAD FOR REST—CONSTRUCTION—VIOLATION OF STATUTORY DUTY. A provision in a contract for the carriage of livestock requiring the shipper to load and unload the stock at his own expense at any place where the same may be unloaded, does not release the carrier from liability for damages by reason of its breach of duty to unload for rest, food and water, as required by the Federal statute.

CARRIERS—LIVESTOCK—DELIVERY—DUTY TO PROVIDE SUITABLE INCLOSURES. A carrier owes the duty to deliver stock to the consignee in or through inclosed lots or yards, and is liable for loss due to the scattering of stock unloaded without the usual and proper facilities.

SAME—KNOWLEDGE OF SHIPPER—CONTRACT—CONSTRUCTION. Where the shipper did not know that there were no proper facilities for unloading stock at the destination, the contract must be construed with reference to unloading where there were usual facilities.

SAME—PRESENTING CLAIM FOR DAMAGES—WHEN IN TIME—PROVISIONS OF SHIPPING CONTRACT. A claim for a loss on the shipment of livestock, required by the shipping contract to be made within ten days, is in due time, where, upon stating the claim within two days

[1] Reported in 82 Pac. 161.

after the loss, the plaintiff was referred to other agents, who finally requested that he write a letter, which he did without delay, stating the claim as fully as it was then known, all within two weeks of the loss.

SAME. A statement in such claim that thirty-five head of cattle (which were turned loose and strayed at the place of destination) are still lost, for which he had offered $2 per head, is sufficient on which to base a claim for depreciation in value by reason of the straying of the lost cattle.

Appeal from a judgment of the superior court for Spokane county, Belt, J., entered December 3, 1904, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, in an action to recover for damages to livestock, shipped on defendant's railroad. Affirmed.

*M. J. Gordon* and *Charles A. Murray,* for appellant.

*Merritt & Merritt,* for respondent.

MOUNT, C. J.—This action was begun by respondent to recover damages for loss of certain livestock shipped from Heppner, Oregon, to Marian, Montana. The complaint alleges, in substance, that the plaintiff loaded twelve cars with cattle at Heppner Station, in Oregon, to be transported to Marian, Montana; that the cattle were loaded on the cars of the Oregon Railroad & Navigation Company at 8 o'clock, a. m., on the 18th day of May, 1903, and were transported over the line of the said railway to Spokane, Washington, where they arrived at 11 o'clock, a. m., on the same day; that said cattle were thereupon transferred and received by the appellant, and were forwarded by it on its line at 1:30 o'clock, a. m., on the 19th day of May, 1903, and arrived at the station at Marian, Montana, at 9 o'clock, p. m., of the 19th day of May; that the said cattle were not being carried in cars where they could have proper food, water, space, and opportunity to rest; that they were confined in said cars for a longer period than twenty-eight consecutive hours without unloading for rest, water, and food; that appellant was not prevented from unloading said cattle by

storms or other accidental causes; and that by reason of the long delay and said cattle being confined in said cars, they became run down and eighteen of them, of the value of $490, died.

The complaint further alleged, that, at the time the cattle arrived at Marian it was a dark night, there were no stock pens or any other appliances necessary or in which said cattle could be confined and kept, and by reason of the darkness of the night, it was impossible for respondent to confine said cattle in any inclosure; that said cattle wandered away and became scattered and lost throughout the country surrounding said town, and that respondent incurred an expense of $145 in collecting them together again; and that a part of said cattle so scattered and lost could not be found for a long time, and they depreciated in value in the sum of $106. Respondent claimed damages in the sum of $741.

Appellant interposed a demurrer to the complaint, which was overruled by the court. Appellant thereupon answered, admitting shipment of the cattle, but alleging that it had no knowledge of the hour when they were shipped from Heppner, and that said cattle arrived at Marian at 8:25 o'clock, p. m., on the 19th day of May, 1903; and denying the other allegations of the complaint. The answer alleged affirmatively that the cattle were delivered to the Oregon Railroad & Navigation Company under the terms and conditions of a contract in writing, signed and entered into between the respondent and the railroad company, as follows:

"The Oregon Railroad and Navigation Company. (Original) Limited Liability Livestock Contract No. 34. (Read this Contract.)

"Heppner, Oregon, Station, May 18th, 1903.

"This agreement, made this 18th day of May, 1903, by and between the Oregon Railroad & Navigation Company, hereinafter called the carrier, and J. E. Reynolds, of Heppner, hereinafter called the shipper.

"Witnesseth: That the said shipper has delivered to the said carrier 12 cars of cattle consigned to J. E. Reynolds, at Marian, Montana, destination, via Spokane, to be transported upon the conditions hereinafter set forth, over the line of the Oregon Railroad & Navigation Company, to Spokane, and there delivered to the consignee, owner or order; or to such company or carrier (if the stock is to be forwarded beyond said station) whose line may be considered a part of the route to destination, it being understood that in and about the delivery of said stock to such connecting carrier the Oregon Railroad & Navigation Company acts only as agent for the consignee or owner, and that the liability of each carrier hereunder shall cease and terminate upon delivery of said stock to the next connecting carrier, the consignee or owner.

"It is expressly agreed that this contract and the responsibility of all the carriers over whose lines the shipment may pass is limited and controlled by the conditions herein contained, which are hereby agreed to by the shipper, and by him accepted for himself and his assigns as just and reasonable. It is further agreed and understood that the person delivering to this company the shipment or any part thereof described herein is authorized to sign this contract for and on behalf of the shipper, with full power in the premises.

"NOTICE. Blooded animals, or animals deemed especially valuable, will be carried only on special contract, and railroad agents are not allowed to receive and ship such animals until a proper contract is made between the owner or consignor and the railroad company or its duly authorized agent.

"Men only, in charge of stock, may accompany the same upon the rules and regulations set forth in circulars issued by the railroad company, and upon executing the release of liability printed on the back hereof.

"Agents of the railroad company are expressly forbidden to contract for delivery of livestock at any specified time, or for any particular market; and no agent of any carrier may under any circumstances alter, change, or modify or agree to alter, change or modify any of the terms of this contract. Special contracts can only be made by the general freight agent, with whom the agent, upon request of the shipper, will communicate by wire. This document must

be presented without alteration or erasure. Said shipper for himself, the consignee or owner, agrees to pay or guarantee the freight thereon at the rate of $.... tariff . . . per standard car of 29 to 30½ feet in length, (subject to established per cent decrease or increase applicable to cars of less or greater length) or $.... per hundred pounds, (subject to established minima for cars of varying lengths) as shown by limited liability tariffs governing, which rate is less than the regular tariff rate for the transportation of livestock at carrier's risk, and is given said shipper at his special request, in part consideration of his agreement to the limitation of the liability of the railroad company as a common carrier upon the terms and conditions herein set forth, which are accepted and agreed to by the shipper as just and reasonable; it being understood that each and every condition of this agreement shall inure to the benefit of each and every carrier over whose line said stock may pass under this contract.

"In consideration of the special reduced rate herein provided for the transportation of the livestock above described, it is hereby stipulated and agreed as follows:

"(1) The carriers shall not be liable for the loss or death of or for any injuries received by any of said stock unless the same is the direct result of wilful misconduct or actual negligence of said carriers, their agents, servants or employees.

"(2) It is expressly agreed that the value of the livestock to be transported under this contract does not exceed the following mentioned sums, to wit: Horses, mules and jacks, not exceeding $100 per head; oxen, bulls or steers, not exceeding $50 per head; cows, not exceeding $30 per head; hogs or calves, not exceeding $10 per head; sheep or lambs, not exceeding $3 per head; and in no event shall the carriers' liability exceed $1,000 upon any carload, such valuation being those whereon the rate of compensation to said carriers for their services and risk connected with the transportation of said livestock is based.

"(3) The shipper agrees to load and reload all said stock at his own expense and risk, and to feed, water and tend the same at his own expense and risk while it is in any stockyards, whether the same be operated, owned or controlled by said carriers or otherwise, and while on the cars

or at feeding points, or at any place where the same may be unloaded for any purpose whatever.

"(4)   The shipper assumes the exclusive duty of properly and securely fastening said stock in the cars and of removing them therefrom, and of keeping such cars, and any inclosure in which said stock may be confined, securely locked or fastened so as to prevent escape of stock therefrom.  The shipper agrees to inspect the cars in which said stock is to be transported, and any yards or inclosures on the premises of the railroad company into which said stock may be unloaded and satisfy himself that they are sufficient and safe and in proper order and condition; and shall report to the agent or employees of said carrier any visible defects therein, and demand necessary repairs, before proceeding to occupy said cars or inclosures, and the fact of his loading said stock into said cars or occupying said inclosures shall be an acknowledgement and acceptance by him of the sufficiency and suitability in every respect of said cars and inclosures for the shipment and yarding thereof; and he hereby assumes all risk of injury which said livestock or any of them may receive in consequence of any of them being wild, unruly, weak, maiming each other or themselves; by or in any consequence of heat or suffocation, or any other ill effects of being crowded or injured; by the burning of straw, hay or other material loaded with or used for feeding the stock or otherwise; and also all risk of damage which may be sustained by reason of delay in transportation, and all risk of escape of any portion of said stock; or loss or damage from any other cause or thing not resulting from the wilful negligence of the carriers, their officers, agents or employees.

"(5)   If the carriers, or any of them, shall furnish any laborers to assist in loading or unloading said stock at any point, no additional charge being made therefor, such laborer or laborers shall while so engaged be deemed exclusively the employees of the shipper, and no carrier shall in any event be liable for any act or thing done or omitted to be done by such laborer or laborers in connection with said stock while so engaged.

"(6)   If the car or cars wherein said stock is to be transported shall be furnished by the shipper and tendered to the carrier for that purpose, said shipper assumes all

risk for, in and about said car or cars, and no liability or responsibility shall attach to any carrier or carriers under this contract arising from or growing out of any insufficiency or defect in the condition of any such car or cars.

"(7) No carrier shall be liable for any loss or damage to said stock by causes beyond its control, by floods, fire, quarantine, disease, riots, strikes, or stoppage of labor, shrinkage in weight, changes in weather, heat, cold, or any other cause not directly the result of gross negligence on the part of said carriers, their agents and servants.

"(8) The shipper expressly agrees to load, unload and care for said stock while upon the cars or premises of the carriers in a careful and humane manner, in strict compliance with the laws of the United States and of each and every state through which said stock may be transported.

"(9) Unless claims for loss, damage or detention are presented within ten days from the date of the unloading of said stock at destination, and before said stock has been mingled with other stock, such claims shall be deemed to be waived, and the carriers and each thereof shall be discharged from liability. Any carrier liable on account of loss or damage to any of said stock shall have the benefit of any insurance that may have been effected thereupon.

"(10) The rules, regulations and conditions prescribed by the carriers for the transportation of livestock as evidenced by their published tariffs, classifications and circulars in force and effect, are binding upon the shipper. The signing of this contract by the shipper or his agent shall be conclusive evidence of knowledge, assent and agreement to each and every stipulation and condition thereof by said shipper.

"Witness my hand, J. E. Reynolds, Shipper.

"The Oregon Railroad & Navigation Company, by J. M. Kernan, Station Agent."

The answer further alleged that said shipment was received by appellant from the Oregon Railroad & Navigation Company at Spokane, on the 19th day of May, 1903, and was transported from Spokane to Marian with all possible dispatch without any misconduct or negligence on the part of defendant, its agents, servants, or employees, and

that said cattle were, at said station of Marian, delivered
to the respondent on the 19th day of May, 1903, at 8
o'clock, p. m., mountain time, and were there and then re-
ceived by him, and no claim for loss or damage or deten-
tion was presented by the plaintiff within ten days from
said 19th day of May, 1903, nor before said stock was
mingled with other stock; and alleged that any claim for
loss or damage to, or detention of, said stock had been waived
by the respondent, and was barred by the terms and condi-
tions of said contract.

To this answer the respondent replied, alleging, among
other things, that he had no knowledge or information suf-
ficient to enable him to form a belief as to whether or not
said cattle were received for shipment and transportation
by said railroad company under and according to the terms
and provisions of the contract set out in the second para-
graph of said affirmative defense, and therefore denies all
that portion of said paragraph relating to said contract; and
alleging the fact to be that whatever contract was signed
by said respondent was signed for the purpose of getting
said cattle transported, and without any knowledge or in-
formation on the part of the respondent as to the contents
of the said contract, or any of the provisions therein con-
tained.   Respondent also, by a further and affirmative re-
ply, alleged, that when he signed the contract he did so with-
out knowledge of its contents or conditions; that, if he
signed said contract at Heppner, the cattle were not received
by appellant and transported upon the conditions of said
contract, but that at Spokane a new contract was made with
appellant, the contents of which were unknown to respond-
ent; that, if respondent made said contract with the Oregon
Railroad & Navigation Company, containing provisions that
he should present any claim for loss within ten days, said
condition was unreasonable and unenforcible and was con-
tained in the contract without his knowledge; that, if said
contract contained any condition or provision that he should

assume all risk of damage by delay, such a condition was unreasonable and unenforcible; that, in the transportation of said cattle, they were delayed for a period of more than twenty-eight consecutive hours without unloading for rest, water, and feeding, and that appellant was not prevented from unloading said cattle by storms or other accidental causes, and that said cattle did not have proper room and space for feeding and rest in the cars, contrary to the laws of the United States of America; that a great deal of time was consumed between Spokane and Marian by the cars in which the cattle were contained being detained upon side-tracks; that, after said cattle were unloaded at Marian, said respondent was delayed for a period of ten days in gathering the cattle together, because they were unloaded upon the open prairie; that, as soon as it was possible for respondent after the said cattle were found, he presented himself to the agent of the railroad company at Marian and was by said agent directed to present the matter to the agent of the company at the city of Spokane, whereupon he proceeded to the city of Spokane and informed the agent Jackson of his losses, and that they were to the extent of $1,000; that said agent Jackson advised him to proceed to his home and write a letter as to the amount of his losses; that thereafter, on the 2d day of June, 1903, in pursuance of said instructions from said agent Jackson, respondent did write a letter in which he informed said Jackson that his losses and damages were $1,000; that the actual loss on account of cattle that had died was $490; that, subsequent to the time of writing said letter, he found nearly all of the cattle; and that, at the time when found, they had depreciated in value.

Appellant filed a motion to strike out certain portions of the reply of the respondent on the ground that the matter contained therein was sham, frivolous, and irrelevant. This motion was denied. Thereupon the case was set for trial, and by consent of the parties was tried to the court

without a jury. At the conclusion of the trial, the court made findings in favor of the respondent, and entered a judgment in his favor for the full amount prayed for in the complaint.

It is unnecessary to set out the findings in this opinion. Appellant first contends that the complaint is. not sufficient because it is not alleged that twenty-eight hours is an unreasonable time to confine cattle in transit without unloading said cattle for rest, water, and food; and that it is not shown that there was any unnecessary delay or that there was any reason stated why appellant should have unloaded the cattle for rest, water, and food, or that appellant was negligent in any manner. The Federal statute, found at § 4386, U. S. Rev. Stats., makes it the duty of railways carrying cattle from one state to another to unload such cattle, after confinement for a period of twenty-eight consecutive hours, for rest, food, and water, unless prevented from so unloading by a storm or other accidental causes.

"And although a penalty is imposed for a violation of this regulation, nevertheless a failure to comply therewith is negligence *per se,* rendering the railroad company liable to the shipper for resulting injuries to the animals." 6 Cyc. 439, and authorities there cited.

Under this rule it was only necessary for the complaint to show a violation of the duty imposed by law and the resulting injury to the plaintiff. These facts were shown, and the complaint therefore states a cause of action.

Appellant argues at length in its brief that the court erred in refusing to strike out certain parts of respondent's reply to appellant's answer because such parts were sham, frivolous, and immaterial. Such errors, if made by the lower court, are harmless here, for the reason that the cause was tried to the court without a jury, and the whole cause is therefore reviewable here *de novo.* In such cases this court disregards matters of evidence or pleadings which are im material. The argument of appellant upon the motion to

strike parts of the reply is based upon the ground that the contract of shipment heretofore set out in full is a valid and binding contract.

Respondent claims that the contract is void because it is unfair, unreasonable, and not consistent with public policy. Conceding for the purpose of this case, without deciding, that the contract in question is a valid and binding contract, we still think the plaintiff is entitled to recover. There is no provision in the contract exempting the appellant from loss by reason of a violation of the duty to unload said cattle for rest, food, and water, as required by law. If there were such provision, it would certainly be void. There is a provision to the effect that the respondent should load and unload said stock at his own expense and risk at any place where the same may be unloaded for any purpose whatever. But this provision cannot be held to relieve the appellant for a breach of duty to unload for rest, food, and water, as required by law, and it is not claimed that an opportunity was given to the respondent to unload for these purposes which he neglected or refused to avail himself of.

It was also the duty of the carrier to deliver the cattle to the consignee in or through inclosed lots or yards convenient to the place of unloading. *Covington Stock-Yards Co. v. Keith,* 139 U. S. 128, 11 Sup. Ct. 461, 35 L. Ed. 73. While the contract provided that the respondent should unload the cattle at his own risk, it did not provide for such unloading at a place where there were no facilities therefor. The evidence shows that respondent did not know that there were no yards or pens or other facilities at the place of destination for unloading the said cattle, and he was not informed thereof. His contract therefore must be construed as made with reference to unloading where there were the usual and proper facilities for such work. There were no facilities for unloading at the place of destination, and none were furnished. By reason thereof respondent's

cattle were scattered, and he was put to extra expense to gather them again. We think there is no provision in the contract which reasonably construed would waive loss on this account.

Appellant also contends that respondent waived any claim for damages by failure to present a claim therefor within ten days from the date of unloading said stock, as provided in the contract. The evidence shows that no written claim was presented until June 2, 1903. The stock was unloaded on May 19, 1903. The contract does not require the claim to be made in writing, or in any specified form. The evidence shows that on the next day after the stock was unloaded, respondent talked with the agent at Marian and told him that he wanted to put in a claim for loss, without mentioning any definite amount; that the agent told respondent to see the agent at Kalispell when he paid the freight; that respondent went to the agent at Kalispell to pay the freight, and talked with him about the claim for damages, and the agent there directed respondent to see Mr. Jackson at Spokane; that, two or three days prior to June 2, 1903, respondent saw Mr. Jackson, who requested him to write a letter, and that he, Jackson, would thereupon attend to the matter right away. Thereupon, on June 2, 1903, respondent wrote the following letter:

"Arlington, Ore., June 2nd, 1903.

"Mr. H. A. Jackson. Dear sir: I shipped a train of cattle from Heppner, Oregon, to Marian, Mont., on the 18th day of May; I left Heppner at 8 o'clock and 30 minutes in the morning, reached Spokane ten minutes to twelve in the night, and I was till after nine the next night getting to Marian, and had a loss of 18 head of cattle, 14 cows, 2 calves and two yearling steers, which were worth $490, and I make claim for that amount. The train should have reached Marian before noon on the 19th, and I would have been $1,000 better off if it had, for the cattle scattered on me trying to get them to pasture in the night, and it took several days of time and expense to get what I got, and

there is still 35 head lost that I have offered $2 per head for. I think you can see my situation. Should you want any further proof of what I say, your people at Marian and also W. F. Hubbart, of Hubbart Cattle Co., Kalispell. Your services were good, only I was kept sidetracked almost half of the time I was on your line with the train. Whose fault it was I don't know. There is a chance to do a lot of business in that section, and if this claim is settled and I get the service in future that I have reason to believe you can give, there is nothing in the way of doing a good deal of business in the future. Hoping to hear from you in the future, I am, yours very truly, J. E. Reynolds."

This claim for damages was within time under the contract. On the next day after the cattle were unloaded, respondent notified appellant's agent that he desired to make a claim for damages. Appellant's agents cannot be permitted to put respondent off from one time to another, and finally be heard to say that no claim was made in time; especially when respondent was asking to make a claim within the time limited. It is true the claim which was sent to the agent of the company in writing made direct demand for only $4.90, the damage then actually known. But it is also stated that there were still thirty-five head lost which respondent had offered $2 per head for. We are of the opinion that this was sufficient to support the finding of damages for the item of gathering and depreciation in value of lost cattle.

Finding no error in the record, the judgment appealed from is affirmed.

DUNBAR, ROOT, HADLEY, FULLERTON, and RUDKIN, JJ., concur.